IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNIFIED SCHOOL DISTRICT NO. 259, ) | |
| Sedgwick County, State of Kansas, ) | |
| Plaintiff. ) | |
| ) | |
| v. ) | Case No. 04-1279-JTM |
| ) | |
| KANSAS ADVOCACY AND ) | |
| PROTECTIVE SERVICES, ) | |
| Defendant. ) | |

<u>MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

<u>Introduction</u>

The Disability Rights Center of Kansas, which is the designated protection and advocacy agency for the State of Kansas, has claimed entitlement to the records or the guardian contact information of students with disabilities who may be subject to abuse or neglect. The Disability Rights Center claims access to the records in the possession of USD 259 pursuant to its federal access authority under the Developmental Disabilities Assistance and Bill of Rights Act and the Protection and Advocacy for Individuals with Mental Illness Act. USD 259, the Wichita school district, has claimed that the privacy protections of the Family Educational Rights and Privacy Act (FERPA) and the IDEA prevent it from releasing either the names of the guardians or the students' records without parental consent. In other words, USD 259 claims that FERPA prevents it from complying with the federal protection and advocacy statutes. This is a declaratory judgment action to determine whether the protection and advocacy statutes apply to public schools and to determine whether FERPA prevents the district from releasing student information to the Disability Rights Center.

There is no dispute of fact. As explained more thoroughly herein, public schools are subject to the P&A statutes and FERPA does not prevent disclosure of student information when it is required by another federal statute. FERPA was intended to protect the privacy rights of a student. It was never meant to prevent an investigation of abuse and neglect by the agency mandated by federal law to protect and advocate the rights of students with disabilities.

Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402, 406 (Kan. 2000). In this case the facts are not in dispute. It is a pure question of law, specifically whether two federal statutes can be construed consistently or, if one must give way to the other, which one prevails.

I. History of Protection and Advocacy Systems

The Protection and Advocacy agencies (P&As) are created by federal statute. The Developmental Disabilities Assistance and Bill of Rights Act (DD Act) was enacted to protect the civil and human rights of persons with developmental disabilities because "inhumane and despicable conditions" were discovered at New York's Willowbrook State School for persons with developmental disabilities. *Equip for Equality, Inc. v. Ingalls Mem. Hosp.*, 292 F.Supp.2d 1086, 1093 (N.D. Ill. 2003). Willowbrook was a New York State institution where people with developmental disabilities were warehoused. Willowbrook was overcrowded and severely understaffed. A Geraldo Rivera expose found the residents naked and dirty and without any educational or recreational programs. There was a tremendous public outcry about the lack of treatment for the residents and the horrible conditions. Congress responded by passing the Developmental Disabilities Assistance and Bill of Rights Act in 1975. The DD Act created the

first protection and advocacy program, directed at persons with developmental disabilities. The Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act was passed in 1986 to protect individuals with mental illness who are similarly "vulnerable to abuse and serious injury." *Id.* The P&As were created to "(1) investigate incidents of abuse and neglect of persons with [] disabilities; (2) pursue legal, administrative, and other appropriate remedies on behalf of such persons to ensure the enforcement of their constitutional and statutory rights; and (3) provide information and referrals relating to programs and services addressing the needs of these persons." *Ala. Disabl. Adv. v. J.S. Tarwater Develop. Ctr.*, 97 F.3d 492, 494-95 (11th Cir. 1996). PAIMI "specifically charges the State's P&A, which is an independent agency, with the duty to 'investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.'" *Office of Protection and Advocacy for Persons with Disabilities v. Armstrong*, 266 F.Supp.2d 303, 310 (D. Conn. 2003)(citing 42 U.S.C. § 10801(b)(2)(B)).

## II. The Disability Rights Center of Kansas

The Disability Rights Center of Kansas is the protection and advocacy agency for Kansas. The Disability Rights Center (DRC), the successor in interest to Kansas Advocacy and Protective Services (KAPS), is a private, 501(c)(3) non-profit corporation. DRC is funded entirely by federal grants. The Disability Rights Center provides legally-based advocacy for the civil and legal rights of persons with disabilities. DRC is independent of state government and service providers. DRC represents the interest of the person with a disability.

DRC is governed by a board of directors. A majority of the board members are persons with disabilities. DRC's executive director, Rocky Nichols, is a non-attorney. DRC also has a

policy and outreach director and a fiscal director who are not attorneys. Six lawyers and three advocates constitute the rest of DRC staff.

DRC has all eight of the protection and advocacy federal grants. The Protection and Advocacy for Individuals with Developmental Disabilities (PADD) grant was created by the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. § 15000 *et seq*., 45 C.F.R. parts 1385 and 1386, and is administered by the Administration for Children and Families of the Department of Health and Human Services (HHS). The Protection and Advocacy for Voting Accessibility (PAVA) grant, established as part of the Help America Vote Act, 42 U.S.C. § 15461, is administered by the Administration for Children and Families of HHS. The Protection and Advocacy for Individuals with Mental Illness (PAIMI) grant is created by the PAIMI Act, 42 U.S.C. § 10801 *et seq.*, 42 C.F.R. part 51, and administered by the Substance Abuse and Mental Health Services Administration of HHS. The Protection and Advocacy for individuals with Traumatic Brain Injury (PATBI) grant, 42 U.S.C. § 300d-53, is administered by the Health Resources and Services Administration of HHS. The Protection and Advocacy for Individual Rights (PAIR) grant is part of the Rehabilitation Act, 29 U.S.C. § 794e, 34 C.F.R. part 381, and is administered by the federal Department of Education. The Protection and Advocacy for Assistive Technology (PAAT) grant was created by the Assistive Technology Act of 1998 (Tech Act), 42 U.S.C. § 3012, 34 C.F.R. part 345, and is administered by the Department of Education. The Client Assistance Program (CAP) grant is part of the Rehabilitation Act of 1973, 29 U.S.C. § 732, 34 C.F.R. part 370, and is administered by the Department of Education. The Protection and Advocacy for Beneficiaries of Social Security (PABSS) grant was created by the Ticket to Work and Work Incentives Improvement Act, 42 U.S.C. § 1320b-21, 20 C.F.R. part 411, and is administered by the Social Security Administration.

DRC investigates abuse and neglect in state hospitals, nursing homes, intermediate care facilities for the mentally retarded, residential treatment facilities and group homes. The Disability Rights Center's legal representation includes abuse and neglect cases, Medicaid, Medicare, guardianship, special education, fair housing, Americans with Disabilities Act, Rehabilitation Act, employment and vocational rehabilitation cases. For example, DRC investigated a report that individuals with mental illness who lived in a group home were being forced to participate in nude therapy and work without pay for the owner of the group home. DRC helped one resident leave the home even though her guardian (who was also the therapist and the owner of the home) opposed it and helped residents get other services in the community after the U.S. Attorney's office and the FBI shut down the homes and arrested the therapist and his wife. In another case, DRC learned that residents of an Intermediate Care Facility for the Mentally Retarded (ICF/MR) had been subject to horrendous conditions, such as having maggots in a feeding tube, being restrained in bed in soiled clothing and being left in the shower for hours. DRC obtained the names of the residents and the information necessary to contact their guardians, got permission from guardians to investigate the incidents, and began an investigation into the abuse and neglect in the ICF/MR. DRC has also investigated a reported incident in which a special education teacher chased a child with a disability and punched him in the chest in a public school.

III. Overview of the Abuse and Neglect System in Kansas

It may be helpful for the Court to have a big picture of the abuse and neglect system in Kansas, of which the Disability Rights Center is one part. As the designated Protection and Advocacy agency for the State of Kansas, DRC is an important part of the abuse and neglect system for the state.

In Kansas, the Department of Social and Rehabilitation Services (SRS) is the agency designated to receive reports of suspected abuse or neglect of a child. SRS investigates reports of abuse or neglect and determines whether action is necessary to protect the child. K.S.A. § 38-1521. SRS, however, considers the scope of its responsibility to be limited to investigations of abuse or neglect by caregivers, not by non-residential schools. Law enforcement agencies can investigate a report of abuse or neglect if they have reason to believe a criminal act has occurred. K.S.A. § 39-1404(a)(1). The State Department of Education is the agency designated to receive complaints regarding the education of a child with a disability under the Individuals with Disabilities Education Act (IDEA). The Department of Education will not investigate a report of abuse or neglect because it is not a denial of a free appropriate public education under the IDEA. DRC is the only entity in the state with the authority to investigate abuse or neglect in schools. Investigating abuse and neglect is DRC's highest priority when considering what cases to accept. The statutory framework allows the P&A to investigate abuse or neglect in schools and DRC is willing to be the agency in Kansas that does so.

## IV. Statutory Framework of the Protection and Advocacy System

Although there are eight protection and advocacy programs, the relevant access authority will be analyzed under only the DD Act (which is also incorporated by the PAIR Act) and the PAIMI Act. The DD Act, PAIMI, and PAIR cover nearly all students receiving special education. These two statutes set out the requirements for a P&A system and describe the P&A's authority to access individuals, facilities and residents in order to investigate abuse and neglect.

### A. Coverage

#### 1. P&A System

The P&A statutes give investigatory authority only to the designated protection and advocacy program for each state. Governor Bennett designated The Disability Rights Center (then KAPS) as the Kansas P&A in 1977. DRC has been awarded the various P&A grants each year since then (except for the CAP which was not awarded to DRC until April 1, 2005). DRC is the protection and advocacy agency under the P&A statutes.

<u>2.</u> <u>Individual with a Disability</u>

The DD Act covers individuals with a developmental disability. A developmental disability is a:

> severe, chronic disability of an individual that –
> i.       is attributable to a mental or physical impairment or combination of mental and  physical impairments;
> ii       is manifested before the individual attains age 22;
> iii      is likely to continue indefinitely;
> iv       results in substantial functional limitations in 3 or more of the following areas of major life activity:
>> (I)  Self-care.
>> (II) Receptive and expressive language.
>> (III) Learning.
>> (IV) Mobility.
>> (V) Self-direction.
>> (VI) Capacity for independent living.
>> (VII) Economic self-sufficiency; and
> v       reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.

42 U.S.C. 15002(8).

To be eligible to be served under the PAIMI Act, one must be an individual with mental illness. An individual with mental illness is defined as an individual "who has a significant mental illness or emotional impairment" diagnosed by a qualified mental health professional and who is either an inpatient or resident of a facility or who lives in a community setting, including their own home. 42 U.S.C. § 10802(a)(4).

### 3.  DRC's authority for access to people, facilities and records

DRC is responsible to investigate abuse and neglect of individuals with disabilities and to pursue legal, administrative or other appropriate remedies to ensure the protection of a person with a disability.  42 U.S.C. §§ 10805(a)(1), 15043(a)(2).  As the designated P&A, DRC is authorized by its federal statutes to have access to (1) individuals with disabilities, (2) facilities providing care or treatment (PAIMI) or locations in which services, supports and other assistance are provided (DD Act), and (3) the records of the individual with a disability.  The information sought about an individual with a disability must be either a "record" within the meaning of the Acts and regulations or must be information such as guardian name and address that is otherwise provided for in the Act.  The relevant definitions of record are discussed more thoroughly below.

The P&A is entitled to the records of an individual with a disability when either a complaint of abuse or neglect has been received or the P&A has probable cause to believe that abuse or neglect has occurred and the individual is either (1) a client who has authorized  the P&A to have the record, (2) unable to authorize access and the individual has no guardian, or (3) a person with a guardian, the guardian has been contacted by the P&A upon receipt of the name and address of such representative, the P&A has offered assistance to resolve the situation, and the guardian or representative has failed or refused to act on behalf of the individual with a disability.  42 U.S.C. § 15043(a)(2)(I), 42 U.S.C. § 10805(a)(4).

### B.  Statutory Construction

In another P&A case, the United States Court of Appeals for the Tenth Circuit set out the rules of statutory construction.

> 'When interpreting the language of a statute, the starting point is always the language of the statute itself.  If the language is clear and unambiguous, the plain meaning of the statute controls.'

*Center for Legal Advocacy v. Hammons*, 323 F.3d 1262, 1267 (10th Cir. 2003)(*citations omitted*).

> 'In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'

*Id.*

> If we find ambiguity, we 'may seek guidance from Congress's intent, a task aided by reviewing the legislative history.'

*Id.*

> Further, if a statute is silent or ambiguous on a particular issue, we must defer to the interpretation of the statute by the agency charged with administering it 'if [that interpretation] is based on a permissible construction,' that is, 'unless it is arbitrary, capricious, or manifestly contrary to the statute.'

*Id.* (*all citations omitted*).

## V.  Access Authority under the DD Act

### The DD Act applies to public schools.

The DD Act gives the P&A authority to investigate reports of abuse or neglect in public schools.  *Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Board of Education*, 355 F.Supp.2d 649 (D. Conn. 2005).  The P&A's federal mandate is to "have the authority to investigate incidents of abuse and neglect of individuals with developmental disabilities if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred."  42 U.S.C. § 15043(a)(2)(B).  Furthermore, in order to meet its obligation to investigate abuse and neglect, the P&A must "have access at reasonable times to any individual with a developmental disability *in a location in which services, supports, and other assistance are provided to such an individual*, in order to carry out the purposes of this subtitle."  42 U.S.C. § 15043(a)(2)(H) (*emphasis added*).  This provision of federal statute gives the P&A authority to serve any individual with a developmental disability anywhere they receive services, including public schools.

<u>The definition of facility does not foreclose P&A access to schools.</u>

The DD Act gives the P&A authority to access persons, facilities and records of an individual with a developmental disability. "Access under this provision is not limited to access to residential locations." *Connecticut Office of Protection and Advocacy*, 355 F.Supp.2d at 657. This case is about DRC's attempt to access records. The Act defines record to include "(1) a report prepared or received by any staff at any location at which services, supports, or other assistance is provided to individuals with developmental disabilities." 42 U.S.C. § 15043(c). Documents prepared by a school or a teacher providing homebound instruction satisfy the definition of "record." Although the regulations implementing the DD Act emphasize the role of the "facility" in defining records, since the amendment of the DD Act in 2000 the scope of a record is no longer limited to a document prepared by a facility. *See* 45 C.F.R. § 1386.22(b) and (c). The regulations were last updated in 1996. The Act was rewritten in 2000 to place a greater emphasis on serving persons with developmental disabilities in the community. With regard to the scope of the records the P&A may access, the definition in the Act controls.

A public school providing special education services to children with disabilities satisfies the definition of facility. The list of settings that are facilities is not meant to be exhaustive. The regulations implementing the DD Act say that facility includes "any setting that provides care, treatment, services and habilitation, even if only 'as needed' or under a contractual arrangement. Facilities include, but are not limited to the following: community living arrangements (e.g. group homes, board and care homes, individual residences and apartments), day programs, juvenile detention centers, hospitals, nursing homes, homeless shelters, jails and prisons." 45 C.F.R. § 1386.19. Public school special education programs provide care, treatment and services

to many persons with developmental disabilities. Thus, they are covered by the DD Act's definition of facility.

<u>Under the DD Act, the School Must Provide the Records.</u>

The DD Act says that the P&A shall have access to all records of an individual with a disability who has a legal guardian, about whom a complaint has been received or the P&A has probable cause to believe the individual has been subject to abuse or neglect, when the legal representative has been contacted by the P&A upon receipt of the representative's name and address, the P&A has offered assistance to the legal representative to resolve the situation, and the representative failed or refused to act on behalf of the individual. 42 U.S.C. § 15043(a)(I)(iii).

The children receiving homebound instruction have legal representatives. Most of the children are minors, and so their parents are their legal representatives. *Connecticut Office of Protection and Advocacy,* 355 F.Supp.2d at 661, *see also* 62 Fed.Reg. 53548, 53552. DRC has alleged the first condition for access to their records is satisfied.

DRC has received a complaint about the education of the students receiving homebound instruction. DRC was contacted by A.G., mother of D.G.. D.G. is a young woman with neurofibromatosis – tumors on the nerves in the face, neck and spine. She had never received a public education at school. She was homebound, on a doctor's order, for all of her 17 years. After receiving the complaint from the mother of D.G., DRC broadened its investigation to find out how many other students were on homebound and receiving only minutes of educational services a day.

DRC has probable cause to believe the students on homebound instruction have been subject to abuse and neglect. Providing an hour a day or less to a student between kindergarten and twelfth grade may be neglect. A normal day is six hours or 360 minutes. USD 259 said that

22 children received more than 90 days of homebound instruction pursuant to an IEP. If these students have IEPs, they are protected by the IDEA. The IDEA requires that all students with disabilities be provided with a free appropriate public education. 20 U.S.C. § 1412(a)(1). Many students with disabilities are placed on homebound instruction. Most students placed at school receive a full day, six hours or 360 minutes of instruction. Many homebound students receive only a few minutes a day or even a week. The huge discrepancy between the amount, duration and scope of educational services for students who are homebound compared to students educated at school is the foundation of probable cause to believe there has been neglect and a denial of civil rights.

The findings in the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, illustrate the history of discrimination in public schools. The legislature found that "more than one-half of the children with disabilities in the United States did not receive appropriate educational services that would enable such children to have full equality of opportunity" prior to the enactment of the Education for All Handicapped Children Act of 1975 (the precursor to the IDEA). 20 U.S.C. § 1400(c)(2)(B). The legislature also found, "1,000,000 of the children with disabilities in the United States were excluded entirely from the public school system and did not go through the educational process with their peers." 20 U.S.C. § 1400(c)(2)(C). The legislature enacted the IDEA's entitlement to a free appropriate public education for all children with disabilities in response to such findings. DRC has probable cause to believe that students on homebound instruction have been subject to abuse or neglect. DRC has satisfied the requirement that the P&A have either a complaint or probable cause to believe the individual has been subject to abuse or neglect.

DRC has not contacted the guardian or legal representative for any other student with disabilities because DRC does not know who they are. USD 259 has failed to comply with the DD Act in that it has not provided DRC with the guardians' names and addresses. The statute imposes on the facility in possession of the records a duty to provide "the name and address of such representative" in a case such as this. 42 U.S.C. § 15043(a)(2)(I)(iii)(III). DRC has met every requirement of the statute up to this point. Here the responsibility to comply with the DD Act belongs to the school district to provide parents' names and addresses so that DRC may seek authorization to access information about the children with disabilities.

DRC has not offered assistance to the legal representatives of the students because they are unknown, and the representatives have not failed or refused to act because they have not been contacted. *See* 42 U.S.C. § 15043(a)(2)(I)(ii)(III and IV). DRC has met the requirements for access to student records.

The School must at minimum provide the Guardian's Information.

The access authority provision of the DD Act requires the school district to provide the guardian's information. 42 U.S.C. § 15043(a)(2)(I)(iii)(III). The regulations implementing the DD Act (written before the most recent version of the statute) further provide:

> If a system is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the Act, it shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name and address of the legal guardian, conservator, or other legal representative of an individual with developmental disabilities.

45 C.F.R. § 1386.22(i).

Even without the clear statutory and regulatory provisions mandating that the P&A be provided with the name and contact information for the parent or guardian before access is denied for lack of authorization, this approach simply makes common sense. It makes no sense

to allow the P&A to access an individual's records only when the P&A already has permission from the individual's guardian when the information the P&A is seeking is the identity of the individual or his guardian. Courts have recognized this dilemma and have found that in such a case the entity holding the records must give the P&A limited information so that it can seek the requisite consent. *See Pennsylvania Protection & Advocacy, Inc. v. Royer-Greaves School for the Blind*, 1999 WL 179797 *9-10 (E.D. Pa. 1999).

In *Royer-Greaves*, the court held that the school was required to give the Pennsylvania P&A a list of the student's guardians, even when the P&A did not have probable cause of abuse or neglect, basing its decision on the P&A's mandate to protect all persons with developmental disabilities, not only clients. *Id.* In *Robbins v. Budke*, the federal district court of New Mexico held that a mental health institution must post a list of residents and guardians with guardian contact information in a place accessible to the P&A so the P&A could contact guardians to obtain consent to obtain a resident's records. *Robbins v. Budke*, 739 F.Supp. 1479, 1489 (D. N.M. 1990). Some courts have allowed the P&A to review limited client information to determine which unascertained individuals are persons with disabilities that the P&A could serve under its statutes. In *Georgia Advocacy Office v. Borison*, 520 S.E.2d 701 (Ga. Ct. App. 1999), the court found that when the P&A had probable cause to believe that persons with disabilities had been subject to abuse and neglect when they participated in drug trials, the P&A was entitled to expeditious review of the records to determine which study participants were disabled persons covered under the statute and which were subject to abuse and neglect. *Id.* This review allowed them to find the identities of persons with disabilities who had been subject to abuse or neglect. *Id.* This situation calls for a similar system.

The Administration on Developmental Disabilities (ADD), which is within the Department of Health and Human Services, adopted the regulation's provision requiring the P&A to be provided the guardian's information if access to the record is denied with the intent that it address the problem of FERPA. The agency information accompanying the final rule stated as follows:

> **Comments:** Several commenters requested including regulations to indicate that the provisions regarding access of records under the Developmental Disabilities Act and regulations take precedence over other Federal statutes and regulations. If that was not possible, commenters wanted language to specifically reference the Federal Education Rights and Privacy Act (FERPA) which sets out certain restrictions on the release of records by educational institutions (20 USC 1232(g); 34 CFR part 99.
> **Response:** We did not include such a provision because such a requirement goes beyond the authority of the Developmental Disabilities Act and these regulations. However, we have included language comparable to PAIMI provisions at § 1386.22(i) on Delay or Denial of Access. If a system is denied access to facilities and its programs, individuals with developmental disabilities, or records covered by the Act or these regulations, it shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name and address of the legal guardian, conservator, or other legal representative of an individual with developmental disabilities. 61 Fed.Reg. 51142, 51147 (Sept. 30, 1996).

It is important to note that the ADD addressed this issue in its DD Act regulations even before the 2000 Amendments to the DD Act, refocusing on serving persons with disabilities in the community. A contrary reading leaves the abused and neglected children with disabilities without protection. Many children in schools have no ability to talk, defend themselves, or move independently. There must be a means for schools to be accountable to allegations of abuse or neglect. The schools control the building, the teachers and staff, and all of the records. One mechanism is the child protective services division of SRS. Another mechanism for accountability is the protection and advocacy system. SRS represents the state and focuses

primarily on abuse by caregivers, not on what happens in schools. The P&A system represents the individual child with a disability through their parent or guardian.

Once the P&A receives the records of the person with a disability, the P&A is required to maintain the confidentiality of the records. 45 C.F.R. § 1386.22(e). A declaratory judgment for DRC in this case merely allows DRC access to parents to give them information about their rights under the IDEA. This is the lowest point of entry. Schools should not use child privacy as a means of keeping information from parents and students with disabilities. Once a client engages the services of DRC, DRC will offer the full range of advocacy services. DRC's non-attorney executive director and director of policy may engage USD 259 in discussions to change policy. DRC may attempt to educate school officials, board members or state representatives. Or, DRC may follow the directions of the client to do non-legal advocacy like informal discussion or mediation. Finally, DRC may assist the parent or child with disabilities to file a formal complaint or due process. An order giving DRC access to a student's guardian contact information does not necessarily mean that any legal action will result. Furthermore, the student's confidential information cannot be given to any entity outside of DRC unless the parent or guardian gives informed consent for DRC to use the student's information for advocacy on behalf of the student.

The school must provide access to individuals with a developmental disability.

The DD Act requires the P&A to "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual, in order to carry out the purpose of this subtitle." 42 U.S.C. § 15043(a)(2)(H), *see also* 45 C.F.R. § 1386.22(f). A special education program in a public school is a place where a student with a disability receives services. Therefore, DRC has authority to

contact students receiving special education in public schools in order to discuss their rights with them or investigate an incident of abuse or neglect.

## VI. The PAIR Act applies to public schools.

The P&A may access persons, records and facilities under the PAIR statute to the same extent it has access under the DD Act. The Protection and Advocacy for Individual Rights (PAIR) statute provides that the P&A will "have the same general authorities, including access to records and program income, as are set forth in subtitle C of the Developmental Disabilities Assistance and Bill of Rights Act of 2000." 29 U.S.C. § 794e(f)(2).

## VII. The PAIMI Act applies to public schools.

## The definition of facility does not prevent P&A access.

"PAIMI authorizes protection and advocacy systems to investigate incidents of abuse and neglect and access an individual's mental health records without regard to an individual's residence." *Connecticut Office of Protection and Advocacy,* 355 F.Supp.2d at 658-659. USD 259 contends the PAIMI Act is not applicable to public schools because public schools are not facilities. What USD 259 fails to acknowledge is that application of the PAIMI Act is not limited to "facilities." Section 10805(a)(1) of Title 42 of the U.S. Code contains the P&A's authority to investigate incidents of abuse and neglect and pursue administrative, legal and other remedies for individuals with mental illness. The word "facility" does not occur in 42 U.S.C. § 10805(a)(1). Section 10805(4) contains the P&A's authority to access records of an individual with mental illness. The word facility does not occur in 42 U.S.C. § 10805(a)(4). Furthermore, the fact that public schools are not in the list of "facilities" means nothing. The list is not meant to be exclusive. The statute says "[f]acilities may include, but need not be limited to . . . ." 42 U.S.C. § 10802(3). Neither the statute nor the regulations say that public schools are excluded

from the definition of facilities. Because public schools, through their special education programs, serve individuals with mental illness, they are subject to the PAIMI Act.

None of the other limitations of the PAIMI Act make only records of a facility eligible for disclosure. The PAIMI statute gives the P&A authority to serve individuals with mental illness. "Individual with mental illness" is defined as an individual "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State" (42 U.S.C. § 10802(4)(A)) who also either is served in a facility (42 U.S.C. § 10802(4)(B)(i)) or "who satisfies the requirements of subparagraph (A) and lives in a community setting, including their own home." 42 U.S.C. § 10802(4)(B)(ii). Therefore, DRC may serve students who have been diagnosed with significant mental illness or emotional impairment who live in their own homes and attend public schools where they receive special education services.

Under PAIMI, "records" includes "reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records." 42 U.S.C. § 10806(b)(3)(A). The P&A statutes are meant to be consistent with each other. The United States District Court for the District of Connecticut found that access under PAIMI could not be limited to residential facilities:

> If OPA's mandate is to protect and advocate the rights of all individuals with mental illness, regardless of whether they are treated as inpatients or outpatients, its access cannot be limited to residential facilities but must extend to all facilities treating individuals with mental illness. To exclude facilities treating individuals who live in a community setting, including their own home, would be counter to the clear language of the statute, as well as its intent.

*Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Hartford Board of Education,* 355 F.Supp.2d 649, 659-660 (D. Conn. 2005).

"Care or Treatment" is defined in the regulations implementing the PAIMI Act as "services provided to prevent, identify, reduce or stabilize mental illness or emotional impairment such as mental screening, evaluation, counseling, bio-medical, behavioral and psychotherapies, supportive or other adjunctive therapies, medication supervision, *special education* and rehabilitation, even if only 'as needed' or under a contractual arrangement." 42 C.F.R. § 51.2 (*emphasis added*). The inclusion of special education in this definition indicates that public schools providing special education are subject to the PAIMI Act and regulations. The relevant records definition in the PAIMI regulations says that the P&A shall have access to "information and individual records, whether written or in another medium, draft or final, including handwritten notes, electronic files, photographs or video or audio tape records" including "information and individual records, obtained in the courts of providing intake, assessment, evaluation, supportive and other services, including medical records, financial records, and reports prepared or received by a member of the staff of a facility or program rendering care or treatment." 42 C.F.R. § 51.41(c)(1). Schools bill Medicaid to provide services covered by Medicaid, like occupational therapy, physical therapy, speech therapy, rehabilitation services, and durable medical equipment. A public school is a program rendering care or treatment because it provides services to identify, reduce and stabilize mental illness and emotional impairment in its special education students.

USD 259 must provide the records under PAIMI.

The PAIMI Act gives the P&A authority to access records of an individual with mental illness when: (1) they have a legal guardian or legal representative (2) a complaint has been received or there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy (3) the legal representative has been contacted by the system upon

receipt of the name and address of the representative (4) the system has offered assistance (5) the representative failed or refused to act on behalf of the individual. 42 U.S.C. § 10805(a)(4)(C).

Most or all of the students whose records have been requested are under the age of 18, so their parents are their legal guardians. *See Connecticut Office of Protection and Advocacy*, 355 F.Supp.2d at 661, 62 Fed.Reg. 53548, 53552.

DRC must have either (1) a complaint or (2) probable cause to believe the health or safety of the individual is in serious and immediate jeopardy. DRC has received a complaint about lack of education in that a DRC client reported receiving only one hour a day of homebound instruction for her entire educational career. We learned that several other children were on homebound instruction and that some received only minutes of instruction a day. DRC can access records of a student with a guardian because DRC has a complaint.

DRC has probable cause to believe that the students on homebound instruction are subject to neglect because they are not receiving an adequate education under the IDEA. The health and safety of the students receiving homebound instruction is in serious and immediate jeopardy because they are not receiving an adequate education. Students are entitled to a free and appropriate public education only until they earn a diploma or they finish the school year in which they reach 21 years of age. A denial of the right to an adequate education must be corrected as soon as possible. Congress has determined that early intervention and continuous services are essential for children with disabilities. That is why the IDEA provides for an extended school year for children who otherwise would regress if they lost three months of daily education in the classroom. The loss of educational benefit seriously jeopardizes the health of a child with a disability.

The P&A is the "final arbiter" of the probable cause determination. *Center for Legal Advocacy v. Earnest,* 188 F.Supp.2d 1251, 1257 (D. Colo. 2002)(under PAIMI), *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689, 693 (D. Ariz. 2000). "To conclude otherwise would frustrate the purpose of the P&A laws to establish an effective system to protect and advocate for the rights of individuals with disabilities." *Id.*

DRC has not received the name and address of any parent, guardian or legal representative of a special education student on homebound instruction, other than A.G., so DRC has not been able to contact the legal guardian to offer assistance. Because no legal guardians or representatives have been contacted, none have failed or refused DRC's offer of assistance on behalf of the individual with a disability.

The declaratory relief requested in this case does not rely on a finding of serious and immediate jeopardy. Even if serious and immediate jeopardy is not established in this case, the court can issue a declaratory judgment that the PAIMI Act applies to public schools and that FERPA does not preclude application of the PAIMI Act.

Guardian Information

DRC is entitled to at least the name address and phone number of the guardian for each student whose records were requested.

> If a P&A system's access to facilities, programs, residents or records covered by the Act or this part is delayed or denied, the P&A system shall be provided promptly with a written statement of reasons, including, in the case of a denial for alleged lack of authorization, the name, address and telephone number of the legal guardian, conservator, or other legal representative of an individual with mental illness.

42 C.F.R. § 51.43.

DRC has requested information from the records of the students with disabilities who are on homebound instruction. USD 259 has denied DRC access to these records because the

parents or guardians have not provided consent under FERPA. According to the PAIMI statute, along with the school district's explanation that access to the records was denied because of a lack of authorization, USD 259 must provide the name, phone number and address for the guardians who could consent to DRC accessing the student's record. USD 259 has failed to comply with the statute. FERPA does not allow a school district to violate other federal statutes. DRC is entitled to the guardian information for each student whose information was requested. The information received by DRC is required to be kept confidential pursuant to the PAIMI Act. 42 U.S.C. § 10806(a).

Access to Individuals.

In addition to access to records, the P&A is entitled under PAIMI to access facilities and individuals with mental illness who are served there. 42 U.S.C. § 10805(a)(3). The implementing regulation requires P&A access to facilities and residents. 42 C.F.R. § 51.42(a). However, it would be better to construe the regulation to allow access to persons with mental illness anywhere they receive care and treatment, and not limit the individuals to "residents." The PAIMI Act is meant to be consistent with the other major P&A statute, the DD Act. The DD Act requires access to individuals wherever they receive services.

VIII. FERPA does not prevent disclosure because the P&A statutes trump the older and more general FERPA statute.

Statutes should be read together and harmonized to regard each as effective.

The P&A Statutes and the Family Educational Rights and Privacy Act (FERPA) are capable of being read together. "The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as

effective." *Public Service Co. of Colo. v. Federal Energy Regulatory Comm'n*, 754 F.2d 1555, 1566 (10th Cir. 1985)(citing *Morton v. Macari*, 417 U.S. 535, 551 (1974)). Therefore, FERPA can be given its full effect: a school district risks losing federal funding if it has a policy of releasing personally identifiable information of students. Although the district makes much of the risk of loss of federal funding for violations of FERPA, this has never happened. It is highly unlikely to ever happen in the future. In 2002, the United States Supreme Court held that FERPA cannot be enforced by individual students by 42 U.S.C. § 1983, and that there is no private right of action to enforce FERPA violations. *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). Despite the application of FERPA, the school district is required to release personally identifiable information about students when a federal statute sets forth specific, limited circumstances under which the school district, as a provider of services to persons with disabilities, is required to release information about a student to a system created by federal statute to investigate incidents of abuse and neglect of a person with a disability. When a school system discloses the name and contact information of the guardian of a student, it does not violate FERPA. As the United States District Court for the District of Connecticut stated:

> Were the phrase 'upon receipt of the name and address of such representative', as used in both the DD Act and PAIMI, to be construed to mean that a protection and advocacy system be required to contact that representative without [the school] providing the name and address, the phrase would be meaningless.

*Connecticut Office of Protection and Advocacy,* 355 F.Supp.2d at 661. It continued:

> Instead, the court reads the phrase to authorize a request by OPA for the names and addresses of students for whom there is the requisite degree of probable cause to demand records under PAIMI and the DD Act. Upon receipt of such information, OPA can attempt to contact legal representatives of such individuals in order to obtain express permission to act on their behalf. Regulations promulgated pursuant to both the DD Act and PAIMI support this interpretation of the statute.

*Id.*

Moreover, DRC is obligated to maintain the confidentiality of any records it receives to the same extent the provider must keep the records confidential.  Under PAIMI (42 U.S.C. § 10806(a)),

> [a]n eligible system which . . . has access to records which, under Federal or State law, are required to be maintained in a confidential manner by a provider of mental health services, shall . . . maintain the confidentiality of such records to the same extent as is required of the provider of such services.

According to the DD Act regulations (45 C.F.R. § 1386.22(e)):  "The Protection and Advocacy System must: (1) Keep confidential all information contained in a client's records . . . ."  Under 45 C.F.R. § 1386.21(i), "Before the P&A system releases information to individuals not otherwise authorized to receive it, the P&A must obtain written consent from the client requesting assistance, if competent, or his or her guardian."  Because of this limitation on the P&A's ability to disclose the records, the congressional intent that a student's educational records be confidential is honored.  Both sets of statutes can be given their intended effect without stretching the intent of the legislature with regard to either one of them.

As the Connecticut federal court found,

> To allow protection and advocacy systems access to records in the limited circumstances provided for in the DD Act, PAIMI, and PAIR does not contravene Congress' intent to maintain parents' and students' confidentiality.  In this case, allowing OPA to access parents' names and contact information serves the purpose of all of the above statutes by allowing OPA to pursue its investigation as required by PAIMI and PAIR while limiting its access to records until it receives authorization from students and parents, as is required by FERPA and IDEA.

*Connecticut Office of Protection and Advocacy,* 355 F.Supp.2d at 664.

<u>To the extent the statutes conflict, the more recently enacted and more specific statute controls.</u>

The result is the same if the statutes conflict.  Even if FERPA was intended to preclude a school district from releasing information about a student even when required by another federal statute, the Court should defer to the more recently enacted and more specific DD Act and

PAIMI Act. The United States Supreme Court had said, "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). This court has used the same canon of statutory construction: "In resolving a possible conflict between the two statutes, it seems logical to give greater weight to the more recent and more specific language . . . ." *Benton v. Union Pac. R. Co.*, 430 F.Supp. 1380, 1385 (D. Kan. 1977).

P&A Acts are more recent and more specific.

It is important to understand the timeline of when each statute was enacted. FERPA was first enacted in 1974. The DD Act was first enacted in 1975. The PAIMI Act was first enacted in 1986. Both the DD Act and the PAIMI Act were amended in 2000 to place a greater emphasis on persons with disabilities being served in the community. Therefore, the P&A statutes are the more recently enacted. "Older statutes . . . are subordinate to new enactments . . ., as the newer statute is the later expression of the legislative intent and so will control if there is a possible conflict between the two." *State ex rel. Tomasic v. Unified Government of Wyandotte County/Kansas City, Kansas*, 955 P.2d 1136, 1152 (Kan. 1998)(*citing State v. Le*, 926 P.2d 638 (Kan. 1996)).

The P&A statutes are also the more specific. While the FERPA statute prohibits general policies of releasing individually identifiable student information, the P&A statutes set out very specific elements that must be met in order for the entity serving the person with a disability to be required to release the information, and then the information is released only to one very specific entity: the state's designated protection and advocacy system. "FERPA's nondisclosure provisions further speak only in terms of institutional policy and practice, not individual

instances of disclosure. See §§ 1232g(b)(1)-(2) (prohibiting the funding of 'any educational agency or institution which has a policy or practice of permitting the release of education records.')." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 288 (2002). "Recipient institutions can further avoid termination of funding so long as they 'comply substantially' with the Act's requirements." *Id.* "General and special statutes should be read together and harmonized whenever possible, but to the extent a conflict between them exists, the special statute will prevail unless it appears the legislature intended to make the general statute controlling." *State ex rel. Tomasic*, 955 P.2d at 1152. One court has held that when determining whether the P&A Acts can be applied to public schools in light of the privacy protections of the IDEA (which incorporates the FERPA provision), the P&A Acts prevail because they are more specific. *Michigan Protection & Advocacy Service, Inc. v. Miller*, 849 F.Supp. 1202, 1208 (W.D. Mich. 1994). "The DD and PAIMI Acts, however, clearly mandate that organizations like [the P&A] have the authority to access DSS facilities and records in specific cases where developmentally disabled and mentally ill individuals are involved. Defendant's reliance on the IDEA is misplaced." *Id.* This same analysis works when considering whether FERPA precludes application of the P&A Acts to a public, non-residential school in Kansas.

USD 259 states in its complaint that "FERPA lists certain situations in which the school need not obtain consent prior to the disclosure of personally identifiable information from student records. Disclosure to an advocacy group, such as DRC, in not one of the listed exceptions." ¶ 10. USD 259 mischaracterizes the reason why DRC claims entitlement to the requested records. DRC is not entitled to the records because it is an advocacy group authorized by FERPA to obtain the records. DRC is entitled to the records because it is the state protection and advocacy system and federal statutes mandate that it investigate incidents of abuse and

neglect of persons with disabilities.  In order to carry out its mandate, the federal P&A statutes expressly give DRC the authority to access records of an individual with a disability wherever that person receives services.  The P&A statutes are the source of DRC's authority to accesss student records, and no exception listed in FERPA is required.

Intent of the Legislature controls: legislative history.

In 2000, both P&A Acts were amended to place a greater emphasis on providing supports in the community for persons with disabilities.  It was just one year after the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring* (527 U.S. 581, 591 (1999)), calling for persons with disabilities to be served in the most integrated setting.  Consistent with the general refocusing of the disability acts, the P&A access authority under both acts was re-written to allow the P&A to serve not only individuals in "facilities," but also to "have access at reasonable times to any individual with a developmental disability in a location in which services, supports, and other assistance are provided to such an individual . . ." Developmental Disabilities Assistance and Bill of Rights, 42 U.S.C. § 15043(a)(2)(H).

The PAIMI Act also provided for individuals living in community settings to be served by the P&A wherever the individual with mental illness is served.  42 U.S.C. §§ 10802(4)(A) and (B)(ii).

> Over the past twenty years tremendous advances in treatment services for mental illness have allowed persons with mental illness to receive needed treatment in the community.  Unfortunately, there has not been a mechanism to ensure that they are receiving the care and advocacy services they need.  This amendment to the current statute would allow the current P&A systems to work on their behalf as well.

S. REP. NO. 106-196, at 26.

The same report that led to the expanded reach of the P&A under PAIMI also described the services that must be addressed by the state plan for providing comprehensive community mental health services.  The report contemplates the establishment of an "organized community-

based system of care for individuals with mental illness." S. REP. NO. 106-196, at 91. It is natural that Congress also contemplated that the P&As be able to access all of the places where services are provided under the plan.

> The plan describes health and mental health services, rehabilitation services, employment services, housing services, *educational services*, medical and dental care, and other support services to be provided to such individuals with Federal, State and local public and private resources to enable such individuals to function outside of inpatient or residential institutions to the maximum extent of their capabilities, *including services to be provided by local school systems under the Individuals with Disabilities Education Act.*

S. REP. NO. 106-196, at 90-91 (*emphasis added*).

The following statements by the major sponsors of the rewritten DD Act shed light on the shift of emphasis from institutions to the community.

> In 1975, Congress created and authorized funding for Protection and Advocacy Systems (P&As) in each state to ensure the safety and well being of individuals with developmental disabilities. The mission of these systems has evolved over the years, initially addressing the protection of individuals with developmental disabilities who lived in institutions, to the present responsibilities related to the protection of individuals with developmental disabilities from abuse, neglect, and exploitation, and from the violation of their legal and human rights, both in institutions and in the community.

145 CONG. REC. S13270 (October 27, 1999) (Statement of Sen. Jeffords).

> This legislation seeks to ensure that individuals with developmental disabilities are able to fully participate in and contribute to their communities through [full] integration and inclusion in the economic, political, social, cultural, and *educational mainstream* of our Nation. It also assists DD Act programs to improve the range and quality of supports and services for individuals with developmental disabilities and their families regardless of where they choose to live.

145 CONG. REC. S14330 (Nov. 8, 1999) (Statement of Sen. Jim Jeffords)(*emphasis added*).

> S. 1809 gives States' Councils, P&A Systems, and Centers increased flexibility. Each program in a State, working with stakeholders, is to develop goals for how to assure that individuals with developmental disabilities and their families participate in the design of and have access to needed community services, individualized supports, and other forms of assistance that promote self-determination, independence, productivity, integration, and inclusion in all facets of community life. Goals may be set in any of the following areas of emphasis: . . . education . . . or other community services.

145 CONG. REC. S14331 (Nov. 8, 1999) (Statement of Sen. Jim Jeffords).

FERPA was not passed as a result of careful consideration by the legislature. It was an amendment to a resolution requesting the President to call a White House conference on library and information services. The privacy provision was not discussed in any committee reports and was not discussed at any length in the Congressional Record. It was later amended and legislative history created.

Tenth Circuit Case Law

The United States Court of Appeals for the Tenth Circuit has construed the P&A Access statutes broadly to effect Congress's intent that the P&As be able to access records of persons with disabilities, reversing the District Court in both decisions. In *Center for Legal Advocacy v. Earnest*, the Court found that the P&A could access emergency room records under PAIMI & PAIR because they were not protected as drug and alcohol records under the federal Public Health Services Act. 320 F.3d 1107 (10th Cir. 2003). That was another case of two conflicting federal statutes. The Court did not have to rule that PAIMI trumped the Public Health Services Act because the records sought were not within the competing Act. *Id.* In *Center for Legal Advocacy v. Hammons*, the P&A sought peer review records from a mental health institute. 323 F.3d 1262, 1273 (10th Cir. 2003). The Tenth Circuit held that PAIMI preempts state peer review and quality assurance statutes. *Id.* The Court found that an actual conflict existed between the federal PAIMI statute and Colorado privilege laws, and held that to the extent the two laws conflict, the PAIMI access provisions of 42 U.S.C. § 10806 prevail over "state laws interfering with access to records under § 10805(a)(4)." *Id.*

IX. Conclusion: It is unreasonable to use child's privacy protections to shelter records when that child has been subject to or is at risk of abuse or neglect.

USD 259 claims that the FERPA statute's prohibition on schools having a policy or practice of disclosing students' educational records prevents it from complying with an abuse or neglect investigation by the P&A when it is alleged that the school district or a school district employee has abused or neglected a student with a disability. The FERPA statute is intended to protect the privacy of a student, not to protect the school. When information about abuse or neglect of a student is disclosed by the school district, the P&A still is required to maintain the confidentiality of the student's educational record. Thus the intent of the legislature that enacted FERPA is realized. It is unreasonable to use a statute intended to protect a student's privacy to keep the abuse and neglect of that student from being investigated.

It is a violation of the DD Act, the PAIMI Act and the PAIR Act to require the P&A to obtain consent from a parent or guardian in order to access the student's records when the school refuses to provide the name of a parent or guardian. USD 259's position on requiring consent without telling DRC from whom to seek it is even more unreasonable in light of the specific statutory requirement that the P&A contact the guardian "upon receipt of the name and address" of the guardian, and the regulatory provisions that if access to records is denied the entity denying access must provide the name and address of the guardian. It is clear that the school district is required to provide the P&A with the guardian's contact information and that this provision of the statute enables the school district to comply with both sets of statutes: FERPA and the DD and PAIMI Acts.

There are no issues of material fact and DRC is entitled to judgment as a matter of law. DRC requests summary judgment.

<u>Request for Oral Argument</u>

DRC request an oral argument on its motion. DRC requests 30 minutes.

Respectfully submitted,

By s/ Kirk W. Lowry
Kirk W. Lowry, # 13315
Summer A. Duke, #21703
Kansas Advocacy & Protective Services
(now Disability Rights Center of Kansas)
3745 SW Wanamaker Road
Topeka, Kansas 66610
(7785) 273-9661
E-mail: kirk@drckansas.org
*Attorney for Defendant KAPS*

### Certificate of Service

I hereby certify that on the 18th day of May, 2005, I electronically filed the foregoing Memorandum in Support of Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, which will forward a Notice of Electronic Filing to the following CM/ECF participants:

Thomas R. Powell          tpowell@hinklaw.com
Sarah Loquist             sloquist@hinklaw.com
Roger Theis               rtheis@hinklaw.com
Hinkle Elkouri Law Firm
2000 Epic Center
301 North Main Street
Wichita, Kansas 67202-4820

s/Kirk W. Lowry
Kirk W. Lowry