HINKLE ELKOURI LAW FIRM L.L.C.
2000 Epic Center
301 North Main Street
Wichita, Kansas 67202-4820
Telephone: (316) 267-2000
Facsimile: (316) 264-1556

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNIFIED SCHOOL DISTRICT NO. 259, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 04-1279-JTM |
| v. | ) | |
| | ) | |
| KANSAS ADVOCACY & PROTECTIVE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF UNIFIED SCHOOL
## DISTRICT NO. 259'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Statutes designed to protect the mentally ill and developmentally disabled from physical abuse, neglect, and mistreatment in an institutional setting do not authorize Defendant's broad demand for production of the personal educational records of public school students receiving special education in U.S.D. 259. Enacted in direct response to revelations of injuries, deaths, and inhumane conditions suffered by developmentally disabled/mentally ill residents of state institutions, the Developmental Disabilities Assistance and Bill of Rights Act (hereafter "Developmental Disabilities Act" or "DDA") and companion statutes established a protection and advocacy system ("P&As") to protect such persons from abuse and enhance the quality of

their care and treatment. The absence of mention of public schools anywhere in their provisions is not an oversight by Congress.

Congress has enacted a thorough and comprehensive statute, the Individuals with Disabilities Education Act (the "IDEA"), specifically designed to assure the provision of an appropriate public education to disabled children attending public schools throughout the nation. Requiring notice to parents regarding the content of the educational services provided to their children, the IDEA erects a system of parental enforcement of special education subject to due process hearings and judicial review and further vests program oversight authority in the U. S. Department of Education and, as delegated, the various state departments of education. The comprehensive remedial scheme established by Congress in the IDEA necessarily controls the quality of the education provided such children - the protection from abuse statutes do not duplicatively establish P&As as the supplemental auditors of special education throughout the nation. Congress' contemporaneous passage of the Family Educational Rights & Privacy Act ("FERPA"), preserving the confidentiality of the educational records of students, solely governs a third party's right of access to such records. What Defendant demands from U.S.D. 259 is directly contrary to FERPA, since no exception to nondisclosure exists for circumstances like here, nor does parental consent exist.

Defendant's far-reaching request for records of U.S.D. 259 students receiving homebound services, seeking such information as their hours of service and the content of their individualized education plans, is unauthorized. Thus, its attempt to overlay general statutes concerning abuse and mistreatment of the mentally ill/developmentally disabled upon the unique

area of special education is well beyond the intended scope of the provisions asserted. The IDEA and FERPA govern, not the DDA or its companion statutes. For these reasons, as amplified hereafter, Plaintiff's motion for summary judgment should be granted and a declaratory judgment should be entered finding that Defendant is not entitled to receive the records or other personally identifiable information of students receiving special education in the District.

## II.    STATEMENT OF UNCONTROVERTED FACTS

1.      Unified School District No. 259 is a unified school district established by the laws of the State of Kansas. (Doc. 8, Stipulated Facts (Appendix 1 hereto), No.1).

2.      The Disability Rights Center of Kansas (hereinafter referred to as the "DRC"), formerly known as Kansas Advocacy and Protective Services—KAPS, is a private, non-profit corporation designated by the State as the protection and advocacy agency (P&A) for the State of Kansas. (*Id.*, No. 2).

3.      Exhibit A is a true and correct copy of the letter dated May 20, 2004, which was sent from Rocky Nichols, executive director of DRC, to Neil Guthrie, the director of special education and support for U.S.D. 259. (*Id.*, No. 3).

4.      Exhibit B is a true and correct copy of the letter dated May 25, 2004, which was sent from Neil Guthrie to Rocky Nichols. (*Id.*, No. 4).

5.      Exhibit C is a true and correct copy of the letter dated June 17, 2004, which was sent from Rocky Nichols to Neil Guthrie. (*Id.*, No. 5).

6.      Exhibit D is a true and correct copy of the letter dated August 10, 2004, which was sent from Sarah Loquist, attorney for U.S.D. 259, to Kirk Lowry, attorney for DRC.  (*Id.*, No. 6).

7.      Dominique Griffin and her mother complained to DRC (then called KAPS) about the nature and extent of educational services provided to her in U.S.D. 259's homebound program and placement at home.  (*Id.*, No. 7).  A due process case was later filed on her behalf by DRC and has been resolved by the parties.  (Appendix 2, Affidavit of Neil Guthrie).

8.      "Homebound instruction" means the delivery of special education and related services in the home of a child with a disability.  K.A.R. 91-40-1(ee).  The District's homebound program is used by students who are unable to attend school due to a medical condition as recommended by a physician.  (Appendix 2, Affidavit of Neil Guthrie).

9.      On May 20, 2004, Rocky Nichols sent a letter to Neil Guthrie.  The letter requested that U.S.D. 259 provide DRC with the number of students on a homebound program, the length of time the students were on homebound, information about the homebound services, and the name of the student, name of the parent or guardian, and the phone number and address of the parent or guardian.  The letter referred to a provision in the regulations implementing the Developmental Disabilities Assistance and Bill of Rights Act ("DDA"), which states that if the program denies access to the records because of lack of authorization, it must provide the name and address of the guardian or "other legal representative" of the person with a developmental disability.  (Appendix 1, No. 8 and Exhibit A thereto).

10.     On May 25, 2004, Neil Guthrie sent a letter to Rocky Nichols stating how many students received homebound instruction during the two previous school years.  Mr. Guthrie said that 61 students received homebound instruction during the 2003-2004 school year.  He stated that 22 students received homebound instruction for more than 90 days in the 2003-2004 school year and the amount of time the student received instruction "varies, depending upon the individual student's needs." (*Id.*, No. 9 and Exhibit B thereto).

11.     Mr. Guthrie, in his May 25, 2004 response, refused to provide the names of students or guardians or the phone number and address of the parent or guardian because it would identify those students as special education students, citing privacy restrictions under the Family Educational Rights & Privacy Act ("FERPA"), 20 U.S.C. § 1232g.  (*Id.*, No. 10 and Exhibit B thereto).

12.     On June 17, 2004, Rocky Nichols responded to Mr. Guthrie by asking for demographic information about the 22 students on homebound services for more than 90 days. He asked for, among other things, the date of birth, grade level, primary disability, cognitive level of functioning, supplemental and related services, date of last IEP meeting with names and positions of all persons in attendance, hours of homebound services per week, title of person providing homebound services, location of homebound services, and percentage of time spent in core curriculum for each of the 22 students on homebound services.  (*Id.*, No. 11 and Exhibit C thereto).

13.     The information sought by Mr. Nichols is "personally identifiable information" contained within education records under FERPA.  (*Id.*, No. 12 and Exhibit D thereto).

14.     On August 10, 2004, Sarah Loquist, attorney for U.S.D. 259, wrote to Kirk Lowry, attorney for DRC.  Ms. Loquist stated that U.S.D. 259 could not provide any of the information requested in the June 17 letter because the information made the student's identity easily traceable and would identify the student's disability and special education services. Therefore, U.S.D. 259 believed it would violate the privacy provisions of FERPA and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1417(c) to comply with the request.  (*Id.*, No. 13).

15.     U.S.D. 259 claims that DRC must have an authorization from the parents or guardians of students in order to be entitled to receive the students' names, their guardians' names and contact information, and information about the students' disabilities and the homebound services they are receiving.  (*Id.*, No. 14).

16.     DRC has not provided authorization from the parents or guardians of the students whose records it has requested because it does not know the identity of 21 of the 22 children receiving homebound services for over 90 days.  (*Id.*, No. 15).

17.     DRC is statutorily obligated to maintain the confidentiality of all the information received from U.S.D. 259.  (*Id.*, No. 16).

18.     On August 24, 2004, U.S.D. 259 filed this declaratory judgment action, seeking a determination that the Developmental Disabilities Act, 42 U.S.C. §§ 15001 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. §§ 10801 *et seq.*, and the Protection and Advocacy for Individual Rights (PAIR) Act, 29 U.S.C. § 794e, are not applicable to public schools and that FERPA and/or IDEA prohibit the release of the information

requested by DRC. (*Id.*, No. 17).

19. FERPA lists certain exceptions under which a school need not obtain prior written consent before disclosing personally identifiable information from student education records. 20 U.S.C. § 1232g; 34 C.F.R. § 99.31. Disclosure to a protection and advocacy agency is not listed as one of the exceptions. (*Id.*, No. 18).

## III. ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

The standard for consideration of a motion for summary judgment is well established. *Quint v. Cox*, 348 F.Supp.2d 1243, 1247 (D.Kan.2004). Under that prevailing standard, there is no genuine issue here as to a material fact, and Plaintiff is entitled to judgment as a matter of law.

### B. STATUTES DESIGNED TO REMEDY ABUSE AND MISTREATMENT OF THE INSTITUTIONALIZED MENTALLY ILL AND DISABLED DO NOT AUTHORIZE OVERSIGHT OF THE QUALITY OF SPECIAL EDUCATION SERVICES PROVIDED TO PUBLIC SCHOOL STUDENTS

#### 1. THE IDEA IS A COMPREHENSIVE REMEDIAL STATUTE WHICH GOVERNS THE QUALITY OF SPECIAL EDUCATION SERVICES PROVIDED TO PUBLIC SCHOOL STUDENTS

Finding that large numbers of disabled children were being denied access to a public education, Congress enacted the IDEA in 1975. 20 U.S.C. § 1400(c)(2)(reciting findings); 20 U.S.C. §§ 1400 *et seq.*[1] The IDEA put in place a comprehensive remedial scheme designed to assure that disabled children between the ages of 3-21 receive a free appropriate public education

---

[1] When first enacted, the statute was designated The Education of the Handicapped Act (EHA). Congress has recently reauthorized and amended the IDEA. Pub. L. 108-446 (effective July 1, 2005).

consisting of special education and related services provided at public expense. 20 U.S.C. §§ 1412(a)(1)(A), 1415; *Murray v. Montrose County Sch. Dist. RE-IJ*, 51 F.3d 921, 925 (10th Cir. 1995). Reviewing the Act for the first time in *Board of Educ. v. Rowley*, 458 U.S. 176 (1982), the Supreme Court held that this substantive provision of the law requires public educational agencies to provide services of sufficient quality and scope so as to confer some meaningful educational benefit upon each child. *Id.*, 458 U.S. at 200.

The Act is premised on the concept of cooperation between parents and educators in formulating an appropriate education for each child. *Schoenfeld v. Parkway Sch. Dist.*, 138 F.3d 379, 381 (8th Cir. 1998). Underscoring this theme is the centerpiece of the Act, the individualized education plan (IEP), which may be formulated only following consultation and input from educators, parents, and specialists, to develop a program individually tailored to the unique needs of each individual child. *Johnson v. Ind. Sch. Dist. No. 4*, 921 F.2d 1022, 1026 (10th Cir. 1990); *Murray v. Montrose County Sch. Dist.*, 51 F.3d at 925.

Cognizant of the inevitability of disputes, Congress established an elaborate remedial framework to address disagreements regarding the content and quality of IEPs. 20 U.S.C. §§ 1415(f-i). Congress intended that any such personally identifiable information regarding a student's education remain confidential and be disclosed only to specifically authorized parties. 20 U.S.C. §§ 1232(g), 1417(c). Recognizing the primary role of the parents, Congress authorized a largely parent-initiated enforcement system whereby the parents may obtain a due process hearing before local hearing officers with special training and experience in addressing the educational problems and needs of disabled children. *Id.*, § 1415(f); *Bd. of Educ. v. Rowley*,

458 U.S. at 208 ("Congress sought to protect individual children by providing for parental involvement in the development of state plans and policies, and in the formulation of the child's individual education program . . . As this very case demonstrates, parents and guardians will not lack ardor in seeking to ensure that handicapped children receive all of the benefits to which they are entitled by the Act.")(citations omitted).  Only after exhausting remedies at this level and upon further administrative appellate review, may a litigant obtain judicial review.  *Id.*, §§ 1415(g-i).  In view of the special expertise of such officers, the law accords substantial deference to their decisions regarding the educational appropriateness of the plan devised for the child.  *Heather S. v. State of Wis.*, 125 F. 3d 1045, 1053 (7th Cir. 1997); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990).

The IDEA and its procedures are mandatory and cannot be bypassed by attempted resort to other statutes providing relief for alleged educational deprivations.  Thus, where a party "has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies, [ ] exhaustion of those remedies is required."  *Padilla v. Sch. Dist. No. 1, City and County of Denver*, 233 F.3d 1268, 1274 (10th Cir. 2000).

Beyond this system for resolution of individual complaints, Congress vested the U. S. Department of Education ("USDOE") as the agency responsible for assuring compliance with federal special education law by state and local educational agencies.  The USDOE is thus authorized to conduct compliance audits of state special education programs to assure the proper expenditure of federal funds and upon finding violations of federal law is empowered to withhold further federal funding from the state.  20 U.S.C. § 1416.  *See also* 20 U.S.C. §§ 1232d

and 1232f (recipients of federal educational funds must assure compliance with federal requirements and are subject to audit by USDOE and Comptroller General). Additional enforcement authority is delegated by the federal government to state departments of education to investigate and audit local education agencies for compliance with the IDEA and its regulations. 20 U.S.C. § 1232c. Moreover, consistent with the IDEA's emphasis upon parental enforcement through due process procedures, federal and state regulations confer upon parents the further right to file a complaint and require an investigation of alleged violations of special education rights by local educational agencies. 34 C.F.R. § 300.660 *et seq.*; K.A.R. 91-40-51.

In view of the comprehensive nature of the IDEA regarding the quality of special education in public schools, it is illogical to assert, as Defendant does here, that Congress also authorized broad review of public school special education programs through separately enacted statutes dealing with abuse and neglect of the developmentally disabled and the mentally ill. As shown in the succeeding section, this conclusion is confirmed by an analysis of the particular statutes upon which Defendant purports to rely. Defendant's attempt to bypass the IDEA is without basis in law.

## 2. THE EDUCATIONAL QUALITY OF THE SPECIAL EDUCATION SERVICES PROVIDED TO PUBLIC SCHOOL STUDENTS IS NOT WITHIN THE SCOPE OF THE PROTECTION FROM ABUSE STATUTES RELIED UPON BY DEFENDANT

### a. THE PROTECTION FROM ABUSE STATUTES

Although pursuing a strictly educational purpose, Defendant relies upon statutes with a decidedly different focus. The origin of the Developmental Disabilities Assistance and Bill of

Rights Act (DDA), 42 U.S.C. §§ 15001, *et seq.* (formerly 42 U.S.C. §§ 6000, *et seq.*) is far removed from education. The DDA was spawned by a Congressional investigation into deplorably inhumane conditions at a New York state institution housing developmentally disabled individuals. *Office of Protection and Advocacy v. Armstrong*, 266 F.Supp.2d 303, 309 (D.Conn. 2003). The culmination of these revelations was the enactment of the DDA, which, as amended, required states receiving federal funds to establish protection and advocacy systems "to investigate incidents of abuse and neglect of individuals with developmental disabilities" based upon receipt of a specific complaint or the existence of probable cause. 42 U.S.C. § 15043(a)(2)(B). Although not defined in the Act, the operative terms "abuse" and "neglect" are defined in its attendant regulations, emphasizing conduct that has caused, or is likely to cause, injury or death to covered persons:

> 45 C.F.R. § 1386.19
>
> *Abuse* means any act or failure to act which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to an individual with developmental disabilities, and includes such acts as: Verbal, nonverbal, mental and emotional harassment; rape or sexual assault; striking; the use of excessive force when placing such an individual in bodily restraints; the use of bodily or chemical restraints which is not in compliance with Federal and State laws and regulations or any other practice which is likely to cause immediate physical or psychological harm or result in long term harm if such practices continue.
>
> *Neglect* means a negligent act or omission by an individual responsible for providing treatment or habilitation services which caused or may have caused injury or death to an individual with developmental disabilities or which placed an individual with developmental disabilities at risk of injury or death, and includes acts or omissions such as failure to: establish or carry out an appropriate individual program plan or treatment plan (including a discharge plan); provide adequate nutrition, clothing, or health care to an individual with developmental

disabilities; provide a safe environment which also includes failure to maintain adequate numbers of trained staff.

The obvious emphasis of these definitions upon physical injury, emotional abuse, and health care treatment plans starkly differs from Defendant's attempt to probe the educational quality of services provided to special education students in the District.

The regulations further define the "probable cause" necessary for access to mean "a reasonable ground for belief that an individual with developmental disabilities has been, or may be, subject to abuse or neglect." Despite a lengthy list of included facilities, public schools are nowhere mentioned in the Act or regulations. (*See Id.*)

The Protection and Advocacy for Individuals with Mental Illness (PAIMI) Act, 42 U.S.C. §§ 10801, *et seq.*, had similar origins. This statute was enacted following a Congressional investigation revealing deaths, injuries, and gross abuse to mentally ill individuals in institutionalized settings. *Robbins v. Budke*, 739 F.Supp. 1479, 1481 (D.N.M. 1990). Concerned that the DDA did not offer protection for such persons, Congress passed the PAIMI, similarly authorizing protection and advocacy systems to investigate and pursue legal action based upon complaint or probable cause of abuse and neglect of such persons. 42 U.S.C. § 10801(b)(2)(B). Congress set forth specific definitions of the operative terms in § 10802, again emphasizing conduct resulting or likely to result in "injury or death" to persons receiving care or treatment in covered facilities:

§ 10802(1) The term "abuse" means any act or failure to act by an employee of a facility rendering care or treatment which was performed, or which was failed to be performed, knowingly, recklessly, or intentionally, and which caused, or may have caused, injury or death to a [sic] individual with mental illness, and includes

such acts as –

> (A) the rape or sexual assault of a [sic] individual with mental illness;
>
> (B) the striking of a [sic] individual with mental illness;
>
> (C) the use of excessive force when placing a [sic] individual with mental illness in bodily restraints; and
>
> (D) the use of bodily or chemical restraints on a [sic] individual with mental illness which is not in compliance with Federal and State laws and regulations.

> § 10802(5) The term "neglect" means a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a [sic] individual with mental illness or which placed a [sic] individual with mental illness at risk of injury or death, and includes an act or omission such as the failure to establish or carry out an appropriate individual program plan or treatment plan for a [sic] individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a [sic] individual with mental illness, or the failure to provide a safe environment for a [sic] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff.

Like the DDA, the Act's focus upon deaths or injuries resulting from care and treatment is qualitatively distinct from Defendant's claim concerning the appropriateness of special education IEPs for disabled students. Again, the enumeration of facilities covered by the Act does not list public schools. 42 C.F.R. § 51.2 (defining "Facility").

The other statute cited by Defendant, the Protection and Advocacy of Individual Rights Act (PAIR), 29 U.S.C. § 794e, contains less detail and specificity. Its introductory section shows that it is intended to assist persons ineligible for protection under either the DDA or PAIMI. 29 U.S.C. § 794e(a)(1). As shown below, the courts have attributed a purpose and focus to this

legislation similar to that accorded the DDA and PAIMI.

The history and text of these statutes provides no indication of a Congressional intent to supplant or supplement the IDEA. Spawned by markedly different circumstances, the focus of these provisions is clearly upon the institutionalized mentally ill and developmentally disabled to assure their safety by eradication of conditions that could cause injury or death. The conclusion that the educational content of special education programs provided in the public schools is not within their purview is reinforced by the case law as discussed in the following section.

### b. THE CONTENT OF THE SPECIAL EDUCATION SERVICES PROVIDED TO DISABLED SCHOOLCHILDREN IS NOT WITHIN THE SCOPE OF THE DDA, PAIMI, OR PAIR

Review of the cases decided under the P&A statutes relied upon by Defendant provides no support for its attempt to create a coordinate system for oversight of special education programs in the public schools. Cognizant of the origins of these statutes, the courts have consistently applied them according to their terms to redress physical abuse and mistreatment of the mentally ill and developmentally disabled arising during the course of their care and treatment in covered facilities.

Representative of the cases applying the DDA and its companion statutes is the decision of the court in *Iowa Protection and Advocacy Services, Inc. v. Gerard Treatment Programs, L.L.C.*, 152 F.Supp.2d 1150 (N.D. Ia. 2001). *Gerard* involved an injunctive action by Iowa Protection and Advocacy Services for access to patients and records of those confined in a psychiatric treatment facility. Relying upon the DDA and PAIMI, the Iowa P&A sought access

following the death of a resident of the institution while being physically restrained by staff. Concluding that the record showed probable cause that abuse had occurred as defined by the Acts, the court ordered production of the records by the hospital.

In *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003), the Tenth Circuit addressed a Colorado P&A's claim for access under PAIMI to the peer review records of a state mental health facility. The demand for records followed the death by suicide of four patients at the facility and an attempted suicide by another resident. The court concluded that the reports were within the definition of records covered by the Act and that PAIMI preempted conflicting state law so as to require disclosure.

The decision of the court in *Wisconsin Coalition for Advocacy, Inc. v. Czaplewski*, 131 F.Supp.2d 1039 (E.D. Wis. 2001), reflects a similar and familiar fact pattern. Citing the DDA and PAIMI, the P&A there sought production of documents from a residential facility for the mentally ill following the death of two residents of the facility. Noting the inhumane conditions engendering the enactment of the DDA, the court determined that probable cause existed for disclosure and that conflicting state law provisions were preempted by the federal Act.

In *Ala. Disabilities Advocacy Program v. J. S. Tarwater Developmental Center*, 97 F.3d 492 (11th Cir. 1996), a P&A asserted a violation of the DDA had occurred in an institution for the severely mentally disabled. The P&A's demand for access to records followed an anonymous tip received by the agency regarding the causes of the deaths of several residents of the facility. Concluding that the subject matter of the investigation was consistent with the purpose of the Act, the court held that the P&A had satisfied the tripartite probable cause test for

access to the deceased patients' records.

*Office of Protection and Advocacy v. Armstrong*, 266 F.Supp.2d 303 (D. Conn. 2003), was a DDA/PAIMI action by a P&A for access to records of inmates confined at facilities operated by the Connecticut Department of Corrections. In circumstances paralleling the cases above, the P&A's demand for access followed publication of newspaper articles detailing the suicides of five inmates in DOC custody. Citing the history of the DDA, the court held that the P&A had established probable cause for access to the records. This common factual scenario is replicated in a number of like cases involving P&As' access to records of a covered facility. *See*, e.g., *Disability Law Center v. Riel*, 130 F.Supp.2d 294 (D. Mass. 2001)(P&A demanded access under DDA to records of a 50-year-old resident of mental health facility after resident's foot was injured by laundry cart and resident was dragged down hallway and physically restrained by medical staff; noting the emphasis in 1990 DDA amendments concerning the health and safety of the developmentally disabled, court grants P&A access to records); *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689 (D. Ariz. 2000)(citing DDA, PAIMI, and PAIR, P&A demanded access to mortality reports of 19 inmates who died in DOC custody; court concludes that probable cause existed to believe that inmates were victims of abuse and neglect under the statutes); *Pa. Protection & Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3rd Cir. 2000)(P&A sought records under PAIMI after learning of death of mental patient in state hospital; court concludes that P&A was entitled to peer review reports regarding the incident and that federal statutes preempted conflicting state law regarding circumstances of disclosure); *Advocacy, Inc. v. The Brown Schools, Inc.*, 2001 WL 1910563 (W.D. Tex. 2001)(suit by P&A under PAIMI for

access to records of a minor student suffering from mental illness who died at private residential facility; court holds that P&A was not entitled to records without guardian's consent but was entitled to contact information regarding the guardian); *Iowa Protection & Advocacy v. Rasmussen*, 206 F.R.D. 630 (S.D. Ia. 2001)(suit under DDA and PAIMI for access to records regarding death of a resident in a state-run facility for the mentally ill; access to records ordered by court); *Unzueta v. Schalansky*, 2002 WL 1334854 (D. Kan. 2002)(KAPS had standing under PAIMI to bring action challenging use of excessive physical and chemical restraints at Larned State Hospital).

Such cases lend no support to Defendant's claim that disagreements regarding the content and quality of special education services provided by public schools under the IDEA are equally embraced by the DDA, PAIMI, and PAIR. Review of such programs here are within the exclusive jurisdiction of the USDOE and the Kansas State Department of Education (KSDE) and not the U. S. Department of Health and Human Services (DHHS), the agency vested with oversight under the P&A statutes. *See*, e.g., 42 U.S.C. § 10802(6)("The term 'Secretary' means the Secretary of Health and Human Services"); 42 U.S.C. § 15002(26)(defining "Secretary" in same fashion). Consistent with the definitional emphasis on death and injury occurring during care and treatment and the origins of the statutes, the decided cases overwhelmingly involve instances of death and physical harm to patients or persons in institutional settings. Defendant's attempt to sift through the IEPs of individual homebound students and assess the sufficiency of the services provided thereunder is far removed from the purpose and language of the statutes and is without legal basis.

## 3.  DEFENDANT'S ARGUMENTS

Based upon prior discussions with Defendant and the absence of any facts or allegations regarding death or injury to students, Plaintiff expects Defendant to contend that non-physical harm of any nature occurring in any setting to a mentally ill/developmentally disabled person is encompassed within the scope of the P&A statutes.  But even giving the broadest and loosest scope to the statutory definitions, such terms cannot reasonably be construed to reach the quality of special education provided by public schools under the IDEA.  While the regulatory definition of abuse under the DDA can include such conduct as extreme verbal harassment, resulting or likely to result in injury or death, no such claim is made or could be made here.  45 C.F.R. § 1386.19.  Defendant simply alleges that homebound students in the District are not receiving adequate services under their IEPs.  The statutory road which Defendant attempts to travel ends far short of the destination it seeks.

Nor can the term "neglect," though more amorphous in scope, be reasonably deemed to apply to the matter in question here.   As defined in the DDA regulations, neglect means a "negligent act or omission" resulting in, or at risk of resulting in, injury or death during the care or treatment of a covered person.  Consistent with the origins of the statutes, the examples given in the definition are conditions associated with mistreatment of the institutionalized mentally ill/disabled, such as lack of nutrition, failure to provide health care, or failure to provide a safe environment.  *Id.*.  Such conditions are non-existent here.

In view of the comprehensive nature of the IDEA, it is particularly illogical to assume that Congress intended to encompass the "negligent" provision/omission of public school

instruction within the "neglect" to be remediated by these statutes. The concept of "educational malpractice" has been consistently rejected as a cause of action by the nation's courts and has been specifically rejected as a concept to be imported into K-12 education under the IDEA. *Ross v. Creighton Univ.*, 957 F.2d 410, 414 and n.2 (7th Cir. 1992)(listing the many jurisdictions that have rejected attempts to impose a standard of care regimen upon education decisions); *Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 526 (4th Cir. 1998)(educational malpractice claim cannot be brought under IDEA). The definitional focus on negligence, necessarily requiring formulation of an appropriate "standard of care," is foreign to education and can have no application here. *Ambrose v. New England Ass'n of Schools and Colleges, Inc.*, 252 F.3d 488, 499 (1st Cir. 2001)(concluding that application of a standard of care analysis to educators' professional judgments is particularly inappropriate). It is presumed that Congress legislates with an awareness of existing law, and statutes should not be construed to create illogical or unreasonable results. *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 351 (1998). Defendant's argument is contrary to the history and text of the provisions upon which it relies.

Defendant's proposed reliance on the decision in *State of Conn. Protection & Advocacy for Persons with Disabilities v. Hartford Bd. of Educ.*, 355 F.Supp.2d 649 (D. Conn. 2005) is misplaced. The P&A there sought access to students and to student records from a special education center for emotionally disturbed children following separate complaints that a number of students had been subjected to unreasonable physical restraint and seclusion resulting in injury. The issue was the validity of Hartford's restraint policy authorizing staff to "use reasonable physical force" when deemed necessary to protect themselves from immediate

physical injury. Based on such complaints, the P&A claimed that prohibited abuse and neglect had occurred under the DDA, PAIMI, and PAIR. The primary legal question was whether the school was a covered facility under the Acts, which the court concluded it was. The court proceeded to hold that the P&A was not entitled to the student records sought by virtue of § 10805(a)(4) of PAIMI; however, the court interpreted the abuse statutes to override FERPA so as to allow the P&A to obtain parental contact information from the District.

The *Hartford* case is clearly distinguishable from the case before this Court. Unlike here, there was no issue made in that case whether the underlying conduct was within the scope of the statutes providing protection from abuse. Indeed, the allegations of unreasonable physical force and seclusion involve a subject matter similar to that revealed in the Congressional investigations prompting the enactment of both the DDA and PAIMI.[2] *See also* 42 U.S.C. § 15009(a)(3)(B)(iii)(providing that physical restraint and seclusion should not be employed against the developmentally disabled unless absolutely necessary). Defendant's broadside records request here reveals its attempted exploration of a distinctly different subject matter: the sufficiency of the special education and related services provided to District students under the IDEA.

Much closer to the circumstances here, the decision in *Washington Protection and Advocacy System, Inc. v. Evergreen Sch. Dist.*, No. C03-5062-FDB (W.D. Wash.), aff'd 71 Fed.App. 654 (9th Cir. 2003), directly supports Plaintiff's construction of the statutes in issue.[3]

---

[2] However, the district court's FERPA analysis is simply wrong. This aspect of its holding is discussed hereafter in section 4b.

[3] This decision is appended hereto as Appendix 3.

The P&A in *Evergreen* sought the records of a number of students following a parental complaint that special education students were collecting garbage for recycling and clearing school lunchroom tables.   The record showed that such participation was included in the students' IEPs, for which they received academic credit.   Such participation occurred with parental consent.   In response to the P&A, Evergreen asserted that the subject matter of the complaint did not constitute abuse and neglect within the scope of the DDA, PAIMI, or PAIR, and that such production was barred by FERPA.

Denying the P&A's request for a preliminary injunction, the district court agreed with Evergreen's contentions.   The court held that the subject matter of the P&A's complaint and its challenge to the IEPs were not within the reach of the DDA and its progeny.   The conduct complained of "d[id] not present a serious risk or potential for injury as contemplated by the P&A Acts."[4]   *Id.*, at 5.   The court also rejected the P&A's request as contrary to FERPA, more of which will be said in section 4.   The court's ruling was affirmed on appeal by the 9th Circuit.

The *Evergreen* decision directly supports Plaintiff's assertion that the DDA and its companion statutes do not concern themselves with the quality and content of student IEPs. Defendant's request for records is outside the intended scope of the protection from abuse statutes upon which it relies.   Congress did not intend therein to erect a coordinate system of special education oversight to supplement or supplant the IDEA.   For these reasons, summary judgment should be entered in behalf of Plaintiff.

---

[4] Recognizing this difference in factual circumstances regarding the presence of covered abuse and neglect, the *Hartford* court distinguished *Evergreen*, in part, on this very basis.   See 355 F.Supp.2d at 663.

## 4.   DEFENDANT'S REQUEST FOR RECORDS AND PERSONALLY IDENTIFIABLE STUDENT INFORMATION IS CONTRARY TO FERPA AND TO THE PROTECTION FROM ABUSE STATUTES THEMSELVES

### a.   DEFENDANT'S JUNE 17, 2004, LETTER

Defendant's letter of June 17, 2004, sets forth a list of demands for broad categories of education records and personally identifiable student information for all students in the District's homebound program receiving services for more than 90 days. Lacking in probable cause, Defendant's sweeping request essentially seeks to perform an audit of the District's homebound program to see if it is being administered in compliance with the IDEA. This demand for access is barred by FERPA and is likewise contrary to the provisions of the protection from abuse statutes themselves.

FERPA places stringent conditions on schools and educational agencies receiving federal funding regarding the confidentiality of student information. The core premise of FERPA is that education records and personally identifiable information concerning students may not be released to third parties without parental consent. 34 C.F.R. § 99.30; *Owasso Ind. Sch. Dist. No. I-011 v. Falvo*, 534 U.S. 426, 428 (2002). *See also* 34 C.F.R. § 99.3 (defining "personally identifiable information" as information such as "[t]he student's name, [t]he name of the student's parent or other family member, [ ], [a] list of personal characteristics that would make the student's identity easily traceable, or other information that would make the students identity easily traceable.")(subsection designations omitted). The same prohibition against disclosure is codified in the IDEA and its regulations, 20 U.S.C. § 1417(c), 34 C.F.R. § 300.571, and

implementing state law, K.S.A. 72-6214, K.A.R. 91-40-50. The phrase "education records" is defined, under the Act, as "records, files, documents, and other materials which contain information directly related to a student [ ] and are maintained by an educational agency or institution or by a person acting for such agency or institution." 20 U.S.C. § 1232g(a)(4)(A). *See* also 34 C.F.R. § 99.3. While the regulations enumerate a list of exceptions from the parental consent requirement, such as production pursuant to court order or disclosure to state educational authorities, no exception even remotely applies to a demand for access by a protection and advocacy organization. *See* 34 C.F.R. § 99.31. The consequences for failure to observe FERPA's nondisclosure mandate is harsh: a school or institution having a pattern or practice of prohibited disclosure is subject to a loss of all federal funding. 20 U.S.C. § 1232g(b)(1); 34 C.F.R. § 99.67.

Bound to preserve the confidentiality of student records, U.S.D. 259 was prohibited by FERPA and the IDEA from providing the information sought by Defendant. Defendant's broad demand for information clearly sought education records containing personally identifiable information protected by the Act, seeking, "date of birth, grade level, primary disability, cognitive level of functioning, supplemental and related services, date of last IEP meeting with names and positions of all persons in attendance, hours of homebound services per week, title of person providing homebound services, location of homebound services, and percentage of time spent in core curriculum for each of the 22 students on homebound services." (Doc. 8, Stipulated Facts, No. 11). Parental consent did not exist for the disclosure, nor did any statutory/regulatory exception to nondisclosure apply to Defendant's demand. Clearly, the broad

release of education records sought by Defendant was in violation of FERPA and IDEA.

In addition, Defendant's demand for records does not satisfy the conditions regulating access under the protection from abuse statutes. The like requirements of the various Acts were summarized by the court in *Arizona Center for Disability Law v. Allen*, 197 F.R.D. 689, 692 (D. Ariz. 2000) as follows:

> The Acts each authorize P&A access to all records of:
>
> (ii) any individual with [covered] disabilities –
> (I) who, by reason of such individual's mental or physical condition, is unable to authorize the system to have such access;
> (II) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
> (III) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities there is probable cause to believe that such individual has been subject to abuse or neglect.
> 42 U.S.C. § 6042(a)(2)(I)(ii)[now 42 U.S.C. § 15043(a)(2)(I)(i-ii)]; *see also* 42 U.S.C. § 10805(a)(4)(B)(same); 29 U.S.C. § 794e(f)(2).

*See* also *Ala. Disabilities Advocacy Program v. J. S. Tarwater Devel. Cent.*, 97 F.3d 492, 497 (11th Cir. 1996).

Defendant's demand fails these prerequisite standards for access. Due to the District's strict compliance with the notice requirements of the IDEA, the students here, all of whom have parents or guardians, are fully aware of their rights and are able to advocate for themselves. Particularly absent is any showing of a complaint regarding the records of 21 of the 22 homebound students involved.[5] Moreover, statutory probable cause is entirely lacking since the quality of special education provided to disabled students does not constitute abuse or neglect

---

[5] The complaining parent initiated an IDEA due process proceeding which has since been resolved. Statement of Uncontroverted Facts, ¶ 7.

under the DDA and its companion statutes. Defendant's attempt to invest itself as the compliance auditor over special education in U.S.D. 259 is without authority, as such investigative role solely belongs to the USDOE or the KSDE. For these additional reasons, DRC is not entitled to receive the education records of the District's homebound students. *See Washington Protection & Advocacy System, Inc. v. Evergreen*, at 6 (holding that complaint of one parent regarding services under IEP did not establish probable cause for all other students in same program). *See also State of Conn. Office of Protection and Advocacy v. Hartford Bd. of Educ.*, 355 F.Supp.2d at 660 (noting P&A's concession that its demand for records of a number of students did not meet requirements of § 10805(a)(4) of PAIMI).

### b.    THE REQUEST FOR PARENTAL CONTACT INFORMATION

In addition to its demand for substantive education records, DRC sought, by its letter of May 20, 2004, personal contact information for the parent or guardian of each student receiving homebound services. (Appendix 1, Stipulated Facts, No. 8 and Ex. A thereto). Responding on May 25, 2004, the District's Special Education Director replied that such request sought personally identifiable information barred from disclosure by FERPA. (*Id.*, No. 9 and Ex. B.) The question before the Court is which regulatory system governs a request for information regarding a student's education.[6] Because of FERPA's specific application to education records, it is FERPA that controls here.

Where they properly apply, the protection from abuse statutes authorize a P&A to obtain

---

[6] This question arises only if the subject matter of the inquiry is deemed to be within the scope of the protection from abuse statutes.

the name, address, and telephone number of the legal guardian, conservator, or other legal representative of a covered individual. *See* 42 C.F.R. § 51.43; 45 C.F.R. § 1386.22(i). FERPA, however, is straightforward and unyielding, prohibiting any disclosure that would identify a student and the educational services received, so-called "personally identifiable information." The phrase is "defined by the Act's regulations as including only the student's name, parent's name, the student's or parent's address, social security number, or other information that would make the student's identity easily traceable. . ." *Doe v. Woodford County Bd. of Educ.*, 213 F.3d 921, 926-27 (6th Cir. 2000); 34 C.F.R. § 99.3. Clearly, the disclosure sought by Defendant is personally identifiable information covered by FERPA; honoring the request would identify the student as one receiving special education and breach the zone of confidentiality provided by federal law, at risk of loss of the District's federal funding. *Washington Protection & Advocacy System, Inc. v. Evergreen*, at 5.

It should be noted that Defendant's demand for parental contact information superficially draws some support from the regulatory history of the DDA. Prior to the recodification of the DDA regulations in 1996, the DHHS responded to the criticism of some commenters that the proposed regulations did not expressly override FERPA regarding the production of education records. Significantly, the DHHS first responded by declaring that the position espoused was contrary to the DDA, which did not permit access to education records as contended by the objectors. The agency then proceeded to observe, however, that the regulations would authorize the receipt of parental contact information in such a circumstance. *See* 61 Fed.Reg. 51147 (Sept. 30, 1996). Given the lack of any reference to public schools in the statute, this latter

interpretation exceeds the authority conferred by the DDA.

Established canons of statutory construction provide a logical manner of resolving the apparent conflict. A familiar principle applied in instances where statutory provisions seemingly collide is that the specific statute governs over a general one. *Edmond v. United States*, 520 U.S. 651, 657 (1997). The specific statutes here are the IDEA and FERPA, governing the provision of special education to students age 3-21 and, correspondingly, assuring the maintenance of student privacy for all school children, including the disabled. In contrast, the P&A statutes are much more general in scope, applying to persons of all ages experiencing conduct that, during their care and treatment, could result in their injury or death in a covered facility. Construing the separate statutory systems in harmony, consistent with another accepted rule of construction, permits each statutory system to operate in its intended sphere of operation. *Vimar Seguros y Reaseguros, S.A. v. M/V SKYREEFER*, 515 U.S. 528, 533 (1995).

No injustice or affront to statutory goals or purposes results from this reconciliation of the provisions; rather, consistent with the manner of operation of public education generally, and the IDEA specifically, parental control and parent-initiation of complaints would be preserved as the mechanism by which educational concerns are addressed. Such result also squares with the protection from abuse statutes, contemplating that P&As will act primarily for those persons lacking a representative to assert their rights. Here, the disclosure of parental names and addresses is not generic or content neutral but identifies specific children as disabled and reveals the specific nature of the instruction received, contrary to FERPA and the IDEA.

Moreover, these statutes do not vest P&As with the authority to solicit clients or

complaints, but only to act after a complaint or probable cause exists. Thus, P&As are not entitled to records or contact information to see if probable cause exists; they are entitled to records or contact information only if probable cause has first been established. Neither a complaint nor probable cause is established here. There is no conduct in this case likely to result in death or injury, and the quality of special education services in the public schools is simply not within the intended scope of the P&A statutes. Thus, the regulatory comment of the DHHS has no application here and Defendant is not entitled to contact information. *See Wash. P&A v. Evergreen* at 6 (denying P&A access to contact information because, *inter alia*, probable cause did not exist that abuse or neglect had occurred; complaint regarding nature of special education program was not encompassed by the P&A statutes and complaint by one parent did not establish probable cause for all other students in same program).

The *Hartford* court's analysis in permitting P&A access to student information deemed personally identifiable by FERPA is wrong. The court's opinion is bereft of any evidence that Congress intended the protection from abuse statutes to override FERPA. The court's professed attempt to harmonize the statutes ignores established principles of statutory construction. Moreover, the direct effect of the court's ruling is to disclose, to an organization not designated as exempt from FERPA, that specific students are receiving special education in the public schools. This breach of privacy is not assuaged by the fact that P&As themselves possess a duty of confidentiality: providing personally identifiable information to a party not authorized by the parents is a breach of FERPA in itself. However, the issue presented in *Hartford*, the extent of force permissible in the restraint of disabled children, renders it clearly distinguishable from the

case at hand.

FERPA and the IDEA control and prohibit the release of the contact information sought by Defendant. There being no dispute as to a material fact, Plaintiff's motion for summary judgment should be granted regarding this issue as well.

## IV.    CONCLUSION

The IDEA and FERPA collectively govern the appropriateness of special education services provided to disabled students and the release of confidential personal information of the students participating in such programs. Enforcement of these statutes lies exclusively with the USDOE. Congress enacted the P&A statutes for entirely different purposes and did not vest P&As or the DHHS with co-equal enforcement authority over special education. Clearly lacking the probable cause contemplated by the P&A statutes, Defendant is without authority to obtain either education records or parental contact information for students in the District's homebound program.

For the reasons expressed herein, summary judgment should be entered in behalf of Plaintiff, U.S.D. 259.

> Respectfully Submitted,
> s/ Sarah J. Loquist
> Roger M. Theis, S.C. #07671
> Thomas R. Powell, S.C. #07348
> Sarah J. Loquist, S.C. #18225
> HINKLE ELKOURI LAW FIRM L.L.C.
> 2000 Epic Center
> 301 N. Main Street
> Wichita, Kansas 67202
> Telephone: (316) 267-2000
> Facsimile:  (316) 264-1556

E-mail: tpowell@hinklaw.com
rtheis@hinklaw.com
sloquist@hinklaw.com
*Attorneys for Plaintiff Unified School District No. 259*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2005, I electronically filed the foregoing *Memorandum in Support of Unified School District No. 259's Motion for Summary Judgment* with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

David G. Summers
Summers & Johnson, P.C.
105 East 5th Street, No. 401
Kansas City, Missouri 64106-1181
E-mail: david@summersandjohnson.com
*Attorneys for Defendant*

Kirk W. Lowry
Kansas Advocacy & Protective Services, Inc.
3745 SW Wanamaker Road
Topeka, Kansas 66610
E-mail: kirk@ksadv.org
*Attorney for Defendant*

By s/ Sarah J. Loquist
Roger M. Theis, SC No. 07671
Thomas R. Powell, SC No. 07348
Sarah J. Loquist, SC No. 18225
301 North Main, Suite 2000
Wichita, Kansas 67202-4820
Telephone: (316) 267-2000
Facsimile: (316) 264-1556
E-mail: tpowell@hinklaw.com
E-mail: rtheis@hinklaw.com
E-mail: sloquist@hinklaw.com
*Attorneys for Plaintiff Unified School District No. 259*